Alexander Del Giorno, J.
This is a claim for $2,019,296.63, based upon alleged damages caused to the claimant by the State’s breaches of a construction contract, errors in the plans, interferences by the State, delays caused by the State during the performance of the contract, and also for work done for which the State refused to pay.
This contract involved the construction of a depressed six-lane concrete highway, divided by a center mall, four bridges and various retaining walls, access roads, exit ramps, grading, etc. The contract was for the construction of a portion of the Cross-Bronx Expressway, about one-half mile in length, between Walton and University Avenues.
The contract was bid on October 20, 1960, executed November 10, 1960, and was awarded November 21, 1960, at which time the claimant was directed to and did proceed with the contract work. The contract was to be completed by September 1, 1962. The contract was substantially completed by September, 1963, and accepted by the State March 10,1964.
*113 The State forwarded its completed final estimate on January 28, 1965, and the claim, which has not been assigned, was filed June 2,1965.
This was a difficult contract, requiring cutting of rock from some 20 feet to 90 feet in the subsurface, said rock being an element commonly found in the Borough of The Bronx, shoring up and reconstruction of the Jerome Avenue Bridge above which also passes the subway elevated, the erection of three more bridges at Macombs Bead, Jessup and Nelson Avenues, the realigning of large water and sewer mains, detour of traffic, closing of certain avenues, refacing the exposed rock in places, and shoring rock in other places with retaining walls. Certain adjacent buildings were to be underpinned while others were to be demolished.
The claimant’s bid was for $6,800,000, which is an indication of the intricate and difficult nature of the job. With supplemental work the contract totalled $9,430,056.19.
At the trial the claimant presented a scale drawing of the job site prepared from the plans. Coloring is used in the drawing to demonstrate effectively the site, the various elements of the contract and their location, as well as the areas which affected claimant’s work when redesigned, delayed or interfered with by the State. The aforesaid drawing depicts in yellow the proposed roadway; in deep red the redesigns and redesigns of redesigns made during the course of construction; and, in a lighter shade of red, or pink, the portions of the job allegedly affected by the aforesaid redesigns upon which work could not proceed or had to be performed piecemeal while the redesigns were being approved. Black hatching represents major areas of interference and consequent work stoppage while claimant awaited the redesigns. Green represents work done according to original designs.
In almost any job, but particularly in a job such as this, a certain amount of redesigning must be expected whether or not specified in the contract, and there is no doubt in the mind of the court that this was within the contemplation of this contract and, of necessity, was considered in the bidding for the contract.
A normal amount of contract designs would have to be redesigned to conform the work to be done to the actual conditions disclosed by the excavation. Experience would compel acceptance by the contractor of a fair quantity of redesigns even if not mentioned in the contract, since a large portion thereof was “ blind ” work and the true nature of the subsurface conditions could not be determined in advance whether there were borings or not.
*114 However, we find here over 70 major redesigns which, when a redesign of the redesign is considered, would present a total of some 85 major redesigns of this job and, from a study of the redesigns as presented on the said map, there is an indication that about 70% to 80% of the entire job was redesigned.
The court doubts that anyone would seriously assert that such complete overhauling of the original contract was within the contemplation of the parties at the time of the execution of the contract. This court certainly does not say so. The court concludes that this state of affairs is a clear indication that sufficient and necessary study of the area and its surroundings was not made by the State prior to the design of the job. The court cannot escape the conclusion that this was either a hurry-up job, an indifferently planned job, or an ineptly conceived job, designed upon inept or insufficient or indifferent study of the terrain, the buildings and other surrounding elements affected thereby. The court concludes that this state of affairs is equivalent to negligence on the part of the State.
As stated heretofore, some of the redesign was to be expected. However, when a redesign was made necessary, it was the duty of the State to modify, to redesign or to redesign the redesigns as quickly as possible, so that the contractor would not be held back in his work, his equipment and men would not remain idle, and the contractor would not be forced to perform contract work hither and yonder, in a hop-skip, hit-and-miss fashion.
We shall discuss in a general manner the issues herein involved. Firstly, it is well to note that the subject contract was to be completed in two years. It was intended to be joined with two other contracts performed by other contractors located immediately east and west of the subject contract. Then these three contracts were only a part of other contract work which, when taken together, were to result in this great highway, the opening of which was eagerly awaited by the State, the city and the people. Time was basically of the essence in all these contracts. Time was of the essence for the State as well as the contractor.
As far as the present contract is concerned, we find that with few exceptions time meant little to the State designers and cooperation was not easily discerned in the necessary decisions required for the redesigns. To be sure, this state of affairs created heat but shed little light. Complaints were made, letters were written, inspections were made, conferences were held, orders and counter-orders were given, redesigns were furnished which were defective (as in Wall C-4), but in almost all cases designs were furnished long after they should have been fur *115 uished. It did not seem necessary to the State to be concerned as to the unnecessary expenses to which this procrastination was putting the claimant, in both men and equipment. This court has presided over many contract cases, but none equalled the indifference to the interests of the claimant, or the State itself, that was disclosed by the testimony herein.
The so-called normal designs became extraordinary by virtue of bureaucratic indolence. At the trial the State’s attorney was presented with this state of affairs, on which he ably tried to defend the State. The State during the trial had recourse time and again to the provisions of the contract to justify the State’s position. Among other contentions, the State insisted that the Department of Public Works has the contractual privilege to devote a minimum of five days to review a design. The testimony herein indicates that months were spent in revising and reviewing some designs. In the factual situation confronting us, we have concluded that, were we to apply only the minimum time suggested, we would discover that the State would have spent at least three and one-half years in a two-year contract, merely to study designs. This privilege of the State is, in a normal contract, salutary and proper. However, where, as here, the normal amount of redesigns is not involved, to permit the State to sit back and do nothing for a long period of time as to almost each and every one of the numerous designs would be tantamount to approval of a right turned into abuse.
It shocks the conscience of this court to find that, as an example, the State has acquired a permanent easement to a corner of an apartment building at 20 Featherbed Lane for the purpose of underpinning it, without making a study of the interior of the building where, during the performance of the contract, it was found that sustaining perpendicular beams in the basement were in the way of the proposed underpinning as well as outside the easement limits. It is disturbing to the court to learn that, considering the fact that the seamy, frayed, fractured nature of the subsurface rock in this area of The Bronx was well known to the State and the designers, a 35-foot excavation of said rock was contemplated at a horizontal distance of only five feet from the existing large apartment house.
The testimony discloses that at 20 Featherbed Lane the underpinning designed was based upon a sketchy design and was concededly defective. Mr. Di Fiore, the State engineer, had to order the claimant to stop operation in the area of 20 Featherbed Lane, which order resulted in halting practically all work on the Jerome Avenue Bridge West, the pumphouse, wall blasting, roadway work, relocation of the large sewer and water pipes and the *116 J eróme Avenue Bridge detour. Following the stop order, at the direction of the State, the claimant procured nationally known underpinning engineers to prepare new plans for underpinning a larger area of the building to guarantee its safety. This new design which proposed to enlarge the area of the building to be underpinned was warranted to do the job properly, a fact which was not disputed by the State. Nevertheless, after many months of pondering and mulling it over, the State decided that the building should be demolished, for the sole reason that the State had finally concluded that it would be cheaper to eliminate the building than to underpin it. Then followed the delay in acquiring the building and evicting the occupants. Some months were lost in this process of indecision, if not inertia.
This indecision and delay regarding the fate of 20 Featherbed Lane was a major holdup of work in this very costly contract which demanded fast and positive decision, but seemed to have been treated as if it were almost inconsequential.
The court will make reference to only one other item of delay and interference, inasmuch as the findings refer to each specific item regarding the issues of this trial. That other major delay was caused when the State also arbitrarily permitted Johnson, Drake & Piper, who had a contract east of claimant’s and which contract had been completed, to retain for two months junk, debris and other material on claimant’s contract site, preventing the claimant’s progressing its contract thereat, while at the west end of its contract the State ordered claimant to provide a passageway for Tully & Di Napoli into their own contract site, interfering with claimant’s progressing its work on Wall 0-4, the pavement and exit for some 30 days.
As to the above delays, it was the State’s contention that it was either within the contemplation of the contract or had been consented to by the claimant. The claimant angrily denied that it consented to Tully’s maintaining a passageway through its working area for over 30 days or that the contract contemplated that Johnson, Drake & Piper could keep on claimant’s contract site their junk, debris and other materials for some two months after completion of their own contract. The court disagrees with the State and accepts the claimant’s position, if for no other reason than the fact that the claimant would be a fool to voluntarily assume staggering expenses without remuneration.
This story, varying only in nuances, runs through the trial testimony. The testimony makes clear the fact that the claimant’s project manager, who graduated from Cornell University as a civil engineer and who is an expert in this field of work (having supervised over $80,000,000 worth of generally similar *117 construction), made complaint after complaint to the consulting engineer and other representatives of the State regarding the loss of time and interference with his sequence of work, which, on almost all occasions, occurred when redesigns of many of the elements of the contract were involved. The State had almost a 100% record of unheeding indifference.
The testimony is quite clear that the nature of the rock in The Bronx is known to the State and contractors. The borings for this job were taken by or for the State at three different periods of time, beginning in 1944. The credible testimony indicates that in a major part of the contract these borings did not furnish the necessary “ average ” information for competent planning and work; rather, they proved to be inadequate or insufficient in most instances.
For whatever reason, during the trial issues were often clouded rather than cleared. A trial requires that issues presented should be accepted or destroyed or explained in whole or in part by extensive cross-examination or opposing testimony. For its part, the State was intent on fencing with the opponent’s proof rather than challenging it by competent proof and valid analysis. Mr. Di Fiore, who was the enigneer on the job for the consulting engineers, who had most to do with this contract work and who, possibly, might have been the most competent State witness, was in court almost throughout the trial, but was never called by the State. The court may surmise that his testimony would not have been very helpful to the State. The court may presume that Mr. Di Fiore’s testimony would, in the main, have corroborated the claimant’s testimony. (Arc Eng. Corp. v. State, 40 N. Y. S. 2d 354, affd. 267 App. Div. 797, affd. 293 N. Y. 819.)
The claimant offered the testimony of a highly qualified independent witness, one Dr. Jacob Feld. He has been a professional engineer since 1926, has specialized in designs of structures and planning both above ground and underground, and has been engaged as a consulting engineer by the City of New York and the Federal Government on many projects and by the State on two Thruway contracts and presently on the South Mall project in Albany with reference to a vast underground garage and the Thruway connections thereto. He has an otherwise notable national and international record.
Dr. Feld testified that he had made a study of the designs and boring data. He asserted that most of the borings in The Bronx which were taken by the State showed or, at best, could show only subsurface conditions as they would be at the location of the borings. He asserted that such borings, where taken, *118 would not disclose the average substrata condition because it is known that the rock in The Bronx is full of troughs, cavitations and seams, with only the certainty that the “ unexpected ” may be expected. (This was also the opinion of the State witness Mr. Zalite, the engineer in charge of structure design, employed by the State consulting engineers.) Dr. Feld explained that, essentially, borings merely showed the condition of the rock where the boring is taken, and it was his opinion, with which, on the basis of the evidence offered, the court agrees, that the State should have taken test pits at various points to determine the conditions of the rock. He asserted that, although test pits are superior to borings in disclosing the true nature of the rock, even test pits might not have been the complete answer because it is a known fact that in that section of The Bronx layers of rock are not horizontal, that seams lie on slopes, that water has seeped into those seams through the years and caused disintegration in the rock; that there are gorges in the rock where even parts of a mastodon have been discovered; that, all in all, the rock mass is not homogeneous. It is fractured and cavitated. He stated that the best method of determining the subsurface condition in this area would have been by means of the use of electronic equipment which was readily available in the market. All in all, it was his opinion that, since borings were taken by the State, borings, as such, should have been taken at a closer distance. He further stated that taking borings within the basement of buildings where buildings were to be underpinned would have furnished the designers the best information for the underpinning. He asserted that the common cause for the redesigns to Walls X-50-H, X-49-N and C-4, affecting six large buildings, was the lack of adequate information regarding the condition of the subsoil rock, the buildings or their foundations.
Throughout Dr. Feld’s cross-examination by the State, there was a clear indication of the State’s intent to prove that the borings, as such, came within the rule set down in the case of Depot Constr. Corp. v. State of New York (19 N Y 2d 109,114): ‘' The borings were intended to indicate conditions in subsurface material from place to place and to make it possible to average them out.” The court finds that the doctrine of the Depot case is not in issue in this case and that the Depot case would apply only peripherally to the issues of this case. The State did not in any essential manner dispute or overcome the testimony of Dr, Feld.
The claim here, however, is not for extra work as in the Depot case, since the State paid for all the extra work performed, whether by force order or supplemental agreement. This claim *119 is for extra expenses incurred by the claimant for delays and interferences with the progress of contract work due to inadequate preparation of and defective designing of the plans for this contract.
However, not all delays may be or will be charged against the State. Many were delays that have to be considered as necessary and within the contemplation of the contract, such as redesigning walls or abutments to conform with the nature of the subsurface after it was dug. Nor will the court .grant to the claimant rental charges for equipment on other than what the court considers fair rental.
Mr. Walter M. Zalite, a graduate of Darmstadt University, Germany, in 1907, was the State’s main witness. He was employed by Shumavon & Buckley, the designers of the contract, as an engineer in charge of structure design. Mr. Zalite testified that routine changes in designs were contemplated in the contract. He defined routine changes as subsurface rock being lower or higher than shown in plans, or the finding of unsuitable material at the elevation contemplated.
He definitely conceded as. not routine but extraordinary changes the redesigns of the wall between Macombs Road and Nelson Avenue, and the demolition instead of the underpinning of the six-story apartment house at 20 Featherbed Lane, and Wall 0-4, among others.
Mr. Zalite conceded that the underpinning provided for 20 Featherbed Lane exceeded the easement limits by 8 to 10 feet and that, actually, in the original plans, the underpinning was not even fully designed. He stated that, in his opinion, the distances between borings were normal although he agreed with Dr. Feld that in this area one had to expect the unexpected. He conceded, though, that it is not the amount of borings taken that counts, but where they were taken. He conceded that for No. 1585 Macomb Road the original plans should have provided for underpinning to protect the building from deep excavation proposed only five feet away from the building. He also conceded that the number of redesigns made on this contract was much higher than the average number of redesigns to be expected in a contract.
It was Mr. Zalite’s opinion that the redesigns on this contract were completed in due time, when one considers the chain of procedures which prevail in the State.
It was worthy of note that an important change in. the steel beams on the Jerome Avenue East Bridge to prevent severe stress was made in the field without recourse to redesigns or delay in time. It occurs to the court that many other changes, especially to walls, could have been similarly effected.
*120 The judgment of this court will be in favor of the claimant in the sum of $1,417,209.19 as set forth in the decision simultaneously handed down by the court.
There were 491 findings of fact filed by the claimant and 373 filed by the State. This memorandum has been prepared to furnish a basis of understanding of the court’s reasoning in passing upon the said findings.